UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN GRAPHICS INSTITUTE, INC., <br><br> Plaintiff, <br><br> v. <br><br> ACQUIRED LEARNING, INC., JUDEANN STIPE, DEAN NOVOSAT, CLARK EDWARDS, SAGE ADVICE, LTD., and CARL LEINBACH, <br><br> Defendants. | Civil Action No. 05-11857 JLT |

**PLAINTIFF AMERICAN GRAPHICS INSTITUTE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

**I.     INTRODUCTION**

Plaintiff American Graphics Institute, Inc. ("AGI") is the victim of egregious unlawful acts committed by Defendants, who used forged or otherwise wrongfully obtained passwords to access Plaintiff's secured, password protected servers, and steal proprietary confidential information for the benefit of their competing company.  As a result of the Defendants wrongful and illegal acts, AGI has already suffered a loss of business relationships with customers worth more than $1.25 million.  Without immediate action, the damage inflicted on AGI may soon become insurmountable.

Accordingly, Plaintiff AGI brings this Motion for Preliminary Injunction under Rule 65 of the Federal Rules of Civil Procedure, seeking injunctive relief under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), trade secret misappropriation pursuant to Massachusetts common law and Mass. G.L. ch. 93, §42, and a common law claim of tortious interference with a business advantage.  The Motion seeks, inter alia, to enjoin the defendants

from further unfair competition, trade secret misappropriation, and unauthorized use of plaintiffs' proprietary content and confidential customer information. Without immediate injunctive relief, AGI is likely to suffer irreparable harm including loss of customers, business, and goodwill, as well as, other harm from the defendants' unlawful use of its confidential customer information.

This is a memorandum of law in support of AGI's Motion for a Preliminary Injunction. AGI files herewith the affidavits of Christopher Smith and Jason Eaddy, and the Declarations of Cyndie Shaffstall and Michael Silverman, attesting to the factual allegations in this memorandum.[1]

## II.  STATEMENT OF FACTS

Plaintiff AGI is actively engaged in the business of providing consulting services and training courses related to computers, software, and electronics. (Smith Aff. ¶5.) AGI and its predecessor, Cyber Solutions, Inc ("Cyber") have been in operation for ten years. (Smith Aff. ¶2.) During that time, AGI has built a strong and positive reputation among publishers and industry professionals. (Silverman Dec. ¶8; Shaffstall Dec. ¶2; Smith Aff. ¶15-17.) As a result, AGI has amassed an extensive customer list, which is stored in a confidential customer database system, and customer scheduling database system. These database systems contain detailed confidential information regarding AGI's customers. The information includes the name, address, phone number, email address and credit card records for each customer. The customer list and customer scheduling database also contain information on the software systems, training plans, software upgrade plans, the software versions being used by each customer as well as

---

[1] References to affidavits filed in connection with Plaintiff American Graphic Institute's Motion For Preliminary Injunction are identified by the last name of the affiant followed by "Aff. ¶ __" or "Aff. Exh. __." References to declarations filed in connection with Plaintiff American Graphic Institute's Motion For Preliminary Injunction are identified by the last name of the declarant followed by "Dec. ¶ __."

2

other technical information. ("Smith Aff. ¶¶19-20; Shaffstall Dec. ¶¶3-4.) In fact, AGI's clients consider this information to be confidential and AGI has confidentiality and non-disclosure agreements with many of its clients that preclude the dissemination of the information contained in the customer database and customer scheduling database. (Smith Aff. ¶22, Exh. A; Silverman Dec. ¶5)

The confidential client information stored in AGI's database systems is secured. AGI employees are provided with access to AGI's database systems on a need-to-know basis. Only select AGI employees are provided access to these database records, and even those that are provided with access may only have tiered access privileges, with only management being provided full database access to the database systems. (Smith Aff. ¶24.)

Only sales personnel and some management are authorized to access AGI's database systems. The databases are secured by passwords, and only authorized users are provided with the special software, password, or location of the databases. Even some senior management are not all provided access to this information. (Smith Aff. ¶25.)

Defendant Judeann Stipe was previously an employee of Cyber and AGI. As an employee of AGI, Stipe received an AGI laptop computer that she was to use while working for AGI. (Smith Aff. ¶30.) She was hired on April 10, 1996, as a part-time employee for Cyber, working two days per week providing clerical support. In October of 1999, Stipe moved into a sales capacity, becoming AGI's only sales representative with the title of Director of Sales. On January 11, 2004, Stipe was promoted to the position of Senior Sales Executive. On June 1, 2004, Stipe became a part-time employee at her request. (Smith Aff. ¶27.) On June 28, 2004, Stipe resigned. Stipes' last day with AGI was on July 1, 2004. (Smith Aff. ¶¶33-34.)

3

As a sales employee, Stipe was originally given "read only" access to AGI's customer database system in Woburn, Massachusetts. When she was promoted to a management position, she was provided with full access to AGI's customer database system. As part of the AGI management team, Stipe held a position of trust and confidence. Stipe's full access to the customer database system enabled her to edit, export and delete records. To access the database system, Stipe was aware of the location, IP address, port number, password methods and security protocols used by AGI. (Smith Aff. ¶31.) Following Stipe's resignation from AGI, Stipe's password to the AGI's customer database system was revoked. (Smith Aff. ¶34.)

Defendant Clark Edwards is also a former employee of AGI. Clark Edwards is formerly the treasurer of AGI. Dean Novostat is a former consultant to AGI, and does business as Sage Advice, Ltd.. On July 19, 2004, Defendants Edwards and Novosat formed the Defendant corporation, ALI. (Smith Aff. ¶39.) Similar to AGI, Defendant ALI is actively engaged in the business of providing consulting services and training courses related to computers and software. (Smith Aff. ¶36.)

Stipe advised AGI management personnel that the reason she was resigning from AGI on June 28, 2004 was to become a full-time "homemaker." (Smith Aff. ¶33.) In the Fall of 2004, however, AGI discovered that Stipe did not in fact intend to become the full-time "homemaker" she said she wanted to be after resigning from AGI. Instead, she began working for Defendant ALI, which was Dean Novosat and Clark Edwards's newly formed company, a direct competitor of AGI. (Smith Aff. ¶38.)

In the late Fall of 2004, AGI also discovered that Defendant ALI and its partner, System Solutions, Inc. had copied significant portions of AGI's website onto their respective websites without AGI's permission. As a result of this unauthorized use of AGI's copyrighted and

4

proprietary content, AGI and Christopher Smith initiated a copyright infringement and unfair competition lawsuit in this Court against Defendants ALI, Judeann Stipe, Dean Novosat, Clark Edwards and the president of System Solutions, Inc., and System Solutions, Inc. and Richard Wein, Civil Action No. 04-12611-JLT.  (Smith Aff. ¶40.)

Though the course of discovery in the copyright infringement suit, in August 2005 AGI determined through documents produced by Carl Leinbach pursuant to a subpoena *duces tecum*, that Stipe had been directing Leinbach to access AGI's scheduling database to gather AGI's customer information for Defendant ALI.  (Smith Aff. ¶¶41-54, Exh. C.)   After discovering this information in August 2005, Christopher Smith, president of AGI, became suspicious that Stipe and others may have attempted on other occasions to obtain AGI's confidential customer information from AGI's database systems.  AGI investigated the possibility that Stipe and others may have attempted to access AGI's customer information on other occasions.  On September 1, 2005, AGI engaged Elysium Digital, LLC a forensic company, to analyze AGI's computer systems to determine if AGI's computer systems had been compromised.   (Smith Aff. ¶54.)

During the course of Christopher Smith's investigation, Stipe's AGI laptop was analyzed, and it became apparent that Stipe had logged-onto AGI's database system and exported customer database files to the laptop after she was no longer an employee of AGI.  (Smith Aff. ¶57.)  Following Stipe's resignation, in accordance with AGI's procedures, on July 1, 2004, Stipe's passwords were revoked.  (Smith Aff. ¶34.)  However, several times on July 2, 2004, Stipe accessed AGI's secured, password protected computers in Woburn, Massachusetts without authorization, using forged passwords, and took information from the database system.  (Smith Aff. ¶¶58-67, Exh. D-L.)  At a time when Stipe was no longer an employee of AGI, she accessed AGI's secured sever on July 2, 2004, for the purpose of wrongfully downloading and converting

5

customer records. (Smith Aff. ¶59.) Specifically, on July 2, 2004, Stipe exported AGI's customer information for New York, Delaware, New Jersey, Maryland, and Washington D.C., downloading more than 22,500 customer records, including 14,000 e-mail records from AGI's secured servers and copied them to her laptop computer in Lancaster, PA. (Smith Aff. ¶¶55-69, Exhs. D-M.)

Defendant Stipe and others continued to access AGI's confidential customer list and customer scheduling databases on other occasions, without AGI's consent. (Smith Aff. ¶¶58-67, 72-79; Eaddy Aff. ¶13-23.) Stipe, Novosat or Edwards accessed AGI's server on at least two other occasions in July and opened AGI's customer database system, accessing more than 63,000 confidential AGI customer records and other AGI confidential information. (Smith Aff. ¶71.) In particular, on July 12, 2004, and July 14, 2004, Judeann Stipe, Dean Novosat or Clark Edwards used forged passwords to break into the AGI customer database. The customer database is a password protected database stored on AGI's file server in Woburn, Massachusetts, and it was accessed from internet protocol ("IP") address 68.82.227.55, using software and computer equipment provided by Sage Advice, Ltd., which is a consulting company operated by Dean Novosat. (Smith Aff. ¶¶72-74, Exhs. N, O; Eaddy Aff. ¶¶13-16.) None of these individuals were authorized to access the password protected database. (Smith Aff. ¶73.)

On July 12, 2004 and again on July 14, 2004 Judeann Stipe sent e-mail messages to various AGI employees. The e-mail messages recorded the IP address of Stipe's computer, which is the same IP address, 68.82.227.55 of the computer that wrongfully accessed AGI's secured, password-protected servers on July 12, 2004 and July 14, 2004. This indicates that the same person or persons that unlawfully connected to AGI's database on July 12, 2004, and July 14, 2004, also sent these e-mail messages. (Eaddy Aff. ¶17-23, Exhs. 2-4; Smith Aff. ¶77.)

As a result of defendants' unlawful activities on AGI's server, AGI has incurred remedial and investigative expenses exceeding $5,000 that are directly attributable to Defendants' unauthorized access to AGI's trade secrets and confidential information.  Specifically, when AGI suspected the security breach, it engaged its information technology ("IT") service provider to reset permissions, passwords, and security privileges, spending an estimated $5,000.  AGI also hired Elysium Digital, LLC to determine whether AGI's computer systems have been compromised.  To date, the cost incurred by AGI for Elysium has been $550 for testing and site visit preparations, $1,555 for onsite review and analysis of data gathered, totaling $2,105.  Also, in order to remedy the breach, AGI is in the process of purchasing new routers and firewalls, which require setup and configuration from its IT provider, totaling an estimated $25,000.  Thus, the remedial and investigative expenses incurred totaled to date are $7,105, and once the new firewalls and routers are in place, AGI's total remedial and investigative expenses will be at least $32,105. (Smith Aff. ¶80.)

Defendants Stipe, Novosat, Edwards and ALI acted purposely to acquire information to which they knew they were not entitled, for the purpose of securing unfair and unlawful profits for themselves.  Through their unauthorized access to AGI's computer databases, they obtained AGI's valuable confidential business information and other confidential proprietary information, and used the information to solicit new customers.  (Smith Aff. ¶79.)

In 2004 and 2005, Defendants Stipe, Novosat, Edwards, and ALI used wrongfully converted AGI customer records to send bulk-email (SPAM) to AGI customers.  This list has been used repeatedly to send thousands of unsolicited SPAM messages to AGI customers. (Smith Aff. ¶81.)

As a direct result of Defendants' unlawful actions, AGI has lost at least significant

amounts of business from two substantial clients, Education Testing Services, Inc. ("ETS") and Adobe Systems, Inc. ("Adobe"). (Smith Aff. ¶82-94.) Financial records indicate that the relationship with these two clients exceeds $1.25 million. (Smith Aff. ¶82.)

Sometime in June 2004, while Stipe was still employed by AGI, Defendant Stipe received sales orders and inquiries from ETS. ETS has been an AGI client since 1998. Defendant Stipe never reported these June 2004 sales orders to AGI's management and accounting department. Instead, these sales were wrongfully diverted and converted by Defendants Stipe, Novostat, Edwards, and ALI. (Smith Aff. ¶¶84-94; Exhs. U-Y.)

### III.   ARGUMENT

**A.   The Standards For Granting a Preliminary Injunction**

A preliminary injunction should issue where, as here, a plaintiff demonstrates: (1) a probability of its success on the merits; (2) the prospect that the plaintiff will suffer irreparable harm absent the injunction; (3) the balance of the relevant equities favors the plaintiff (ie., the hardship to the plaintiff if an injunction does not issue outweighs the hardship to the defendants if it does); and (4) the effect of the court's action in issuing the injunction is consistent with the public interest. See EF Cultural Travel BV v. Explorica, Inc., 274 F.3d 577, 581 (1st Cir. 2001); Matos v. Clinton School District., 367 F.3d 68, 73 (1st Cir. 2004); Analogic Corp. v. Data Translation, Inc., 371 Mass. 643, 647 (1976).

AGI is overwhelmingly able to make this showing. First, pursuant to the Computer Fraud and Abuse Act ("CCFA"), Defendants have committed criminal acts by wrongfully obtaining passwords and accessing AGI's secured, password protected servers and stealing proprietary information for the benefit of their competing company. Defendants have also misappropriated AGI's trade secrets in violation of Mass. G.L. ch. 93 §42 and Massachusetts

common law, and interfered with AGI's business advantage.

Second, without an injunction, Defendants will continue to use AGI's confidential customer lists and information in their competing business and AGI continues to suffer irreparable harm, by way of ongoing lost profits, customer goodwill and business.

Third, the balance of the relevant equities favors the injunction. To date, AGI has lost business relationships worth *at least* $1.25 million dollars, as a result of the Defendants' acts. To the contrary, the Defendants, who have built a business based upon a theft, fraud and misappropriation of AGI's confidential customer information, cannot defeat a preliminary injunction by claiming that that their business will be harmed if they are merely forced to respect AGI's customer lists and information. The injunction will not infringe upon the defendants' right to *legally* compete within the marketplace for its services.

Finally, there is a strong public interest in granting a preliminary injunction. AGI has been victimized by the Defendants' violation of a federal criminal statute and misappropriation of their proprietary confidential information. The public has an interest in discouraging this misconduct and safeguarding against further harm.

**B.** **<u>AGI Will Likely Succeed on its CFAA Claims</u>**

When the Defendants knowingly broke into the computer databases owned by AGI, they violated the Computer Fraud and Abuse Act. Pursuant to 18 U.S.C. § 1030 (a)(4), anyone who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value…shall be punished . . . ." 18 U.S.C. § 1030 (a)(4). Similarly, under § 1030 (a)(5), anyone who "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes . . . loss to 1 or more persons during any 1-year period (and, for

purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $ 5,000 in value . . . shall be punished . . . ." See 18 U.S.C. §1030 (a)(5)(A)-(B).

The evidence in this case overwhelmingly indicates that defendants have violated the CFAA.  First, defendant Stipe exceeded her authorized access on at least one occasion when defendant Stipe downloaded confidential business information and trade secrets onto her computer while she was still employed by AGI.  Second, on multiple occasions after Stipe resigned from AGI and began working for the competing ALI, at least one of the Defendants accessed AGI secured computer databases using forged or wrongfully acquired passwords.  For example, using a forged password, Judeann Stipe, Dean Novosat or Clark Edwards accessed AGI's server on two other occasions in July and opened AGI's customer database system, accessing more than 63,000 confidential AGI customer records and other AGI confidential information. (Smith Aff. ¶71.)  The database was accessed using the user name "Sage Advice" from the internet protocol ("IP") address 68.82.227.55, which is the same IP address as the computer that sent e-mails signed by Judeann Stipe on the same day. (Eaddy Aff. ¶¶13, 16, 17-23; Smith Aff. ¶¶75-76.) Defendants had no authorization to access these databases and their actions clearly indicate that they knew they had no authorization.  (Smith Aff. ¶78.)

Furthermore, Defendants acted with an intent to defraud AGI.  Defendants acted purposely to acquire information to which they knew they were not entitled, for the purpose of securing unfair and unlawful profits for themselves.  Through their unauthorized access to AGI's computer databases, Defendants obtained AGI's valuable trades secrets, confidential business information and other confidential proprietary information, and used the information to solicit

new customers. (Smith Aff. ¶¶78-79.)

While the CFAA is primarily a criminal statute, § 1030(g) provides the authority for civil actions to obtain compensatory damages and injunctive or other equitable relief for victims of this crime. This section requires that civil relief can only be granted if one of the factors in § 1030(a)(5)(B) is satisfied. In this case, AGI meets the factor described in § 1030(a)(5)(B)(i) that provides relief when there has been "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value."

With respect to calculating losses under the CCFA, the First Circuit has held that the CFAA provides relief for more than just losses directly caused by the unauthorized accessing of a computer system, rather, losses include remedial and investigative expenses incurred by the plaintiff. See, e.g., EF Cultural Travel BV v. Explorica, Inc., 274 F.3d 577, 584-85 (1st Cir. 2001). In EF Cultural Travel BV, the court reasoned that interpreting the statute to cover only purely physical damage "would not only impair Congress's intended scope of the Act, but would also serve to reward sophisticated intruders. As we move into an increasingly electronic world, the instances of physical damage will likely be fewer while the value to the victim of what has been stolen . . . undoubtedly will loom ever-larger." Id.

Here, AGI has incurred remedial and investigative expenses exceeding $5000 that are directly attributable to Defendants' unauthorized access to AGI's trade secrets and confidential information. Specifically, when AGI suspected the security breach, it engaged its information technology ("IT") service provider to reset permissions, passwords, and security privileges on its server, costing over $5,000. AGI hired Elysium Digital, LLC to confirm whether AGI's computer systems have been compromised. To date, the cost incurred by AGI for Elysium has been $550 for testing and site visit preparations, $1,555 for onsite review and analysis of data

gathered, totaling $2,105.  Also, in order to remedy the breach, AGI is in the process of purchasing new routers and firewalls, which require setup and configuration from its IT provider, totaling an estimated $25,000.  Thus, the remedial and investigative expenses incurred totaled to date are $7,105, and once the new firewalls and routers are in place, AGI's total remedial and investigative expenses will be $32,105.  (Smith Aff. ¶80.)

Moreover, AGI's continues to suffer even more significant economic losses.  The Ninth Circuit has found that a company may collect damages for its lost business, business goodwill, and for the cost of restoring parts of its business that were affected by competitor's violations because all of those things constitute economic damages that are recoverable under Act.  See Creative Computing v Getloaded.com, LLC, 386 F.3d 930, 935 (9th Cir. 2004); but see Nexans Wires S.A. v. Sark-USA, Inc., 319 F. Supp. 2d 468, 477 (S.D.N.Y. 2004).  As the court in Creative Computing explained, "[w]hen an individual or firm's money or property are impaired in value, or money or property is lost, or money must be spent to restore or maintain some aspect of a business affected by a violation, those are 'economic damages.'"  Id.  Here, AGI's reputation and goodwill have been harmed by the Defendants' actions and AGI continues to lose business as a result.  While these losses are not readily quantifiable, the evidence demonstrates that they far exceed $5,000.  For example, the Defendants cumulative acts have assisted them in interfering with the relationship between AGI and ETS, and AGI and Adobe.  The relationships with these two clients alone have earned AGI more than $1.25 million.  (Smith Aff. ¶82.)

Because of the overwhelming evidence of the Defendants' blatant violation of the CFAA, a preliminary injunction is appropriate.  See EF Cultural Travel BV v. Explorica, Inc., supra, 274 F.3d at 585 (affirming trial court's grant of a preliminary injunction based on a violation of 18 U.S.C. §1030(a)(4)); Creative Computing v Getloaded.com, LLC, supra, 386 F.3d at 937-38

(affirming trial court's broad injunction based on defendants' violation of, inter alia, the CFAA).

C.     **AGI Will Likely Succeed On Its Trade Secret Misappropriation Claims**

Massachusetts common law and Mass. G.L. ch. 93, § 42 prohibit the misappropriation of trade secrets. A trade secret is "anything tangible or intangible, or electronically kept or stored, which constitutes, represents, evidences, or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention, or improvement." Mass. G. L. ch. 266, § 30(4).

Massachusetts common law provides for a remedy in tort for trade secret misappropriation. "The crucial issue to be determined in cases involving trade secrets . . . is whether the information sought to be protected is, in fact and in law, confidential." Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972). "A list of customers may properly constitute a trade secret, 'if the person entitled to a trade secret wishes to have its exclusive use in his own business, he must not fail to take all proper and reasonable steps to keep it a secret.'" Export Lobster Co., Inc. v. Bay State Lobster Co., Inc., No. 92-6348-E, 1994 Mass. Super. LEXIS 90, at *19 (Mass. Super. Ct. Oct. 31, 1994) citing J.T. Healy & Son Inc. v. James A. Murphy & Son. Inc., 357 Mass. 728, 736, 738 (1970).

In determining whether information is a trade secret or confidential in fact and in law, courts consider:

> "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

13

Jet Spray Cooler, Inc. v. Crampton, supra, 361 Mass. at 840.

Further, "Massachusetts law recognizes that a plaintiff may obtain relief from a defendant who wrongfully acquires plaintiff's confidential information, even if the information fails to qualify for protection as a trade secret." Jensen Tools, Inc. v. Contact East Inc., No. 92-10970-Z, 1992 U.S. Dist. LEXIS 14432, at *5 citing USM Corp. v. Marson Fastener Corp., 379 Mass. 90, 104 (1979).  Massachusetts courts have found that a myriad of business records are either confidential or are trades secrets.  See id., at *2-3 (list of employees and the number of employees in each department among list of information considered confidential); Jillian's Billiard Club of America, Inc. v. Beloff Billiards, Inc., 35 Mass. App. Ct. 372, 375 (1993) (financial information, including accounting procedures are trade secrets); *In re* Civil Investigative Demand Addressed to Yankee Milk, Inc., 372 Mass. 353, 360 (Mass. 1977)(full membership lists protected as trade secret); United Rug Auctioners, Inc. v. Arsalen, No. CA03-0347, 2003 Mass. Super. LEXIS 189, at *15 (information concerning vendors, places of sale, times of sale, prices and mix of rugs, and financial information are confidential and proprietary).

In this case, AGI has offered evidence that the information contained on the customer list and customer scheduling databases is of a type not known outside of the business and could not easily or properly be acquired or duplicated by others. (Silverman Dec. ¶¶4-10; Shaffstall Dec. ¶¶3-5; Smith Aff. ¶¶15-26.)   The information consisted not only of names and addresses, but information relating to:

1. The name of the person in charge of discussing training services at each client company, as well as that person's e-mail, telephone number and address; and

2. Detailed information about the about each particular client including: the versions of software used by the client, the computer platform used, the client's historical record of

14

hiring outside training services, the client's preferred payment methods, the client's billing terms, the client's pending inquiries, the dates inquiries were made and by whom within the client organization, individuals in charge of making decisions to hire outside consulting and training firms, where the client was met, and which instructors have previously delivered training or provided consulting services. (Smith Aff. ¶19.) This confidential information is subject to trade secret protection. (Silverman Dec. ¶¶4-10; Shaffstall Dec. ¶¶3-5; Smith Aff. ¶¶15-26.)

Second, in assessing the reasonableness of security precautions, the courts consider the following relevant factors:

> (1) the existence or absence of an express agreement restricting disclosure, (2) the nature and extent of security precautions taken by the possessor to prevent acquisition of the information by unauthorized third parties, (3) the circumstances under which the information was disclosed . . . to (any) employee to the extent that they give rise to a reasonable inference that further disclosure, without the consent of the possessor, is prohibited, and (4) the degree to which the information has been placed in the public domain or rendered 'readily ascertainable' by the third parties through patent applications or unrestricted product marketing.

USM Corp v. Marson Fastener Corp., 379 Mass. 90, 98 (1979). In determining whether the precautions taken were reasonable, "a plaintiff's conduct in maintaining its security measures against the conduct of a defendant in acquiring the information." Id. Thus, when assessing the reasonableness of the security precautions, the Court must consider the conduct of both parties.

As detailed above, AGI employed reasonable security measures in order to safeguard the secrecy of its trade secrets and proprietary information. The databases containing the customer list and customer scheduling were secure, password protected, and only accessible to a designated group of employees. Furthermore, only authorized employees were given special software that allowed for access to the secured databases, and there were procedures to revoke

15

access privileges to the database records for employees who left AGI. The confidential business information that was misappropriated by the Defendants was secured in this manner.

Given the reprehensible actions by the Defendants, AGI's security precautions are reasonable under Massachusetts law. On numerous occasions, Defendants, without authorization, broke into AGI's databases using forged or wrongfully obtained passwords. Defendants did this after Stipe's employment with AGI had ended and after her password had already been changed. There is no doubt that this access was unauthorized.

Additionally, Defendants exceeded their authorization to confidential business information when they copied corporate financial information onto their own computers. Defendants misappropriated this information with the intent to use it in the development of a competitor business. Such reprehensible actions should weigh heavily when considering the reasonableness of the security precautions taken by AGI.

Finally, "the essence of an action for the wrongful use of trade secrets is the breach of a duty not to disclose or to use without permission confidential information acquired from another." Jet Spray Cooler, Inc v. Crampton, 377 Mass. 159, 165 (1972). Massachusetts case law "undoubtedly prescribes former employees from misappropriating the trade secrets learned during their former employment." Harvard Apparatus, Inc., v. Cohen, 130 F. Supp. 2d 161, 174 (D. Mass. 2001). As detailed above, Defendants did not have permission to use or disclose AGI's trade secrets or confidential information.

Additionally, a person who "unlawfully takes, carries away, conceals, or copies, or by fraud or by deception obtains, from any person or corporation, with intent to convert to his own use, any trade secret" is liable under Mass. G.L. ch 93, §42 for misappropriation of trade secrets.

16

**D.      AGI Will Likely Succeed On Their Tortious Interference With Business Advantage Claim**

Defendants have interfered and continue to interfere with an advantageous relationship between AGI and their customers in violation of Massachusetts law. To succeed on a claim of tortious interference with a business advantage claim, AGI must show that (1) there was a business relationship or contemplated contract of economic benefit; (2) the defendants had knowledge of such a relationship; (3) the defendants interfered with the relationship through improper motive or means; and (4) plaintiff's loss of advantage directly resulted from defendants' conduct. See American Private Line Services, Inc. v. Eastern Microwave, Inc., 980 F.2d 33, 36 (1st Cir. 1992) citing, United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 551 N.E.2d 20, 12 (1990).

First, to establish an advantageous business relationship, AGI need not show that they had a binding contract. Instead, AGI can show that there was a "probable future business relationship anticipating a reasonable expectation of financial benefit." Id. In this case, AGI has proof that the Defendants interfered with at least one specific customer, ETS. Furthermore, Defendants accessed the customer list database and contacted customers with whom AGI has an ongoing business relationship. AGI often has repeat customers and thus has a reasonable expectation that these customers would again retain its services.

Second, it is undisputed that Defendants had knowledge of the business relationship between AGI and the customers in the customer list database. Since Defendants acquired the information used to contact these customers from AGI's own database, there is no doubt that each Defendant had actual knowledge of the relationship.

Third, Defendants interfered with AGI's business relationships through improper means and with improper motive. By contacting known customers of AGI using information

17

unlawfully obtained, Defendants employed improper means for interfering with AGI's business relationships. By intentionally accessing AGI's databases and confidential business information with the intent to take customers away from AGI, Defendants acted with improper motive.

Finally, AGI's loss of advantage is the direct result of the Defendants' actions. Had the Defendants not wrongfully acquired and used the information contained in AGI's customer list and customer scheduling databases, AGI would have maintained the business advantage they had with those customers. For example, had Defendants not interfered with the relationship between AGI and ETS, or AGI and Adobe, AGI would have maintained a business relationship both ETS and Adobe. The relationships with these two clients alone has earned AGI more than $1.25 million.

E.     **The Threat Of Irreparable Harm**

If Defendants Stipe, Novosat, Edwards, and ALI are allowed to continue to use information acquired through the misappropriation of AGI's trade secrets and confidential information, AGI will suffer damages due to the loss of business, goodwill and reputation. Over the years, AGI has developed a strong reputation based on its expertise and the quality of the services it provides. (Shaffstall Dec. ¶2; Smith Aff. ¶¶15, 16; Silverman Dec. ¶¶8, 9.) Defendants' current actions have harmed and will continue to harm this reputation. (Smith Aff. ¶¶20, 79-94; Silverman Dec. ¶10; Shaffstall Dec. ¶5.)

Moreover, when a plaintiff demonstrates likelihood of success on a misappropriation of trade secrets claim, it need not prove irreparable injury because such harm is presumed. See EchoMail, Inc. v. Am. Express Co., 378 F. Supp. 2d 1, 8 (D. Mass. 2005).

**F.     The Balance Between This Harm And The Injury That Granting The Injunction Will Inflict On Other Interested Parties**

The balance of hardships weighs heavily in favor of AGI. Defendants actions have caused harm and will continue to cause harm to AGI's goodwill, reputation and business relationships. To date, AGI has suffered a loss of business relationships with customers worth more than $1.25 million dollars, which is causally connected to the Defendants' conduct. (Smith Aff. ¶¶79-94.)

Conversely, injunctive relief will only harm the Defendants to the extent that they have benefited from their wrongful actions. The Defendants, who have built a business based upon a theft, fraud and misappropriation of AGI's customer information, cannot defeat a preliminary injunction by claiming that that their business will be harmed if they are merely forced to respect AGI's customer lists and confidential information. The injunction will not infringe upon the defendants' right to *legally* compete within the marketplace for its services. See e.g, Pacific Aerospace. & Elec., Inc. v. Taylor, 295 F. Supp. 2d 1188, 1199, (ED Wash. 2003), partial summary judgment gr, mod, 295 F. Supp. 2d 1205 (finding that the balance of harm tipped decidedly toward the plaintiff who provided undisputed evidence that customer list and proprietary information had been used by the defendant in an effort to solicit business in competition with plaintiff).

**G.     The Issuance Of An Injunction Is In The Public Interest**

The issuance of the injunction is in the interest of the public. When trade secrets or confidential information are misappropriated "[t]he law puts its imprimatur on fair dealing, good faith, and fundamental honesty. Courts condemn conduct which fails to reflect these minimum accepted moral values by penalizing such conduct whenever it occurs." USM, supra, 379 Mass at 104. Allowing the Defendants, who have engaged in criminal conduct, to continue using the

Plaintiffs' hard-earned trade secrets and confidential business information, which was misappropriated by the Defendants' for their own benefit to compete with AGI, would undermine the principles of good faith and fair dealing in business relationships.

## IV.   CONCLUSION

Given the legitimate interests AGI seeks to protect, including confidential information, good will, and trade secrets, AGI is entitled to injunctive relief.  Moreover, given Defendants' willful misappropriation of AGI's confidential information, AGI should be granted a preliminary injunction in the form requested in the motion filed herewith.

AMERICAN GRAPHICS  INSTITUTE, INC.

By its attorneys,

Dated: September 26, 2005

/s/ Giovanna H. Fessenden
John L. DuPré   (BBO No. 549659)
Giovanna H. Fessenden (BBO No. 654681)
Hamilton, Brook, Smith & Reynolds, P.C.
530 Virginia Road
P.O. Box 9133
Concord, Massachusetts 01742-9133
Telephone:  (978) 341-0036
Facsimile:   (978) 341-0136

576947_1.DOC

### CERTIFICATE OF SERVICE

I, Giovanna H. Fessenden, hereby certify that on September 26, 2005, service of the foregoing was made on all counsel of record through facsimile and first class mail.

/s/ Giovanna H. Fessenden
Giovanna H. Fessenden